In re DI SIMONE.[1]

(District Court, E. D. Louisiana. March 2, 1901.)

No. 13,641.

1. ALIENS—DECISION OF IMMIGRATION OFFICERS—REVIEW OF JURISDICTIONAL
QUESTIONS.

The finality and conclusiveness of a decision of immigration officers refusing a person entry into the United States, and ordering his deportation, depend upon the jurisdictional question whether such person is in law and fact an alien immigrant; and, where he claims a status of citizenship under the naturalization laws of the United States, the courts have jurisdiction to determine such claim, notwithstanding its adverse determination by the executive officers of the government.

2. SAME—HABEAS CORPUS PROCEEDINGS—ISSUES AND PROOF.

Petitioner, a child, applied to the circuit court for a writ of habeas corpus, alleging that she was illegally held by respondent, the collector of the port, who was about to deport her to Italy. She claimed rights of citizenship on the ground that her father and mother were residents of the United States, and her father, before sending for her, had taken out his first citizenship papers. Respondent in his answer alleged that petitioner was an alien immigrant, and that it was his duty to deport her, under Act March 3, 1891 (1 Supp. Rev. St. [2d Ed.] c. 551), because it was disclosed, on legal and proper official authority, that she had trachoma, which was "a loathsome or a dangerous contagious disease." Petitioner offered evidence in support of her petition, but no evidence was introduced by respondent. Certain papers were, however, pinned to his answer, and referred to therein as "annexes," consisting of a copy of his report, giving "the facts and circumstances of the case, and a copy of the telegraphic order from the commissioner general of immigration" directing petitioner's deportation. Such papers were unverified, and were not filed or offered in evidence. *Held*, that such papers could not be considered as in evidence, but, even if so considered, while they might be sufficient to justify the action of respondent under the rules of the department, they were not competent evidence in a court of any proceedings which authorized him to hold petitioner for deportation.

On Petition for Writ of Habeas Corpus.

Fernando Estopinal and Jos. P. Derbes, for Di Simone.
W. W. Howe, U. S. Atty., for collector.

BOARMAN, District Judge. The petitioner claims that she is not an alien immigrant, under the statute, and resists, in these proceedings, the purpose of the respondent collector to deport her to Italy. Respondent, in showing cause for his action, alleges that the child is an alien immigrant, and as such it is his duty, under an act approved March 3, 1891 (1 Supp. Rev. St. [2d Ed.] c. 551), to cause her deportation, because it is disclosed, on legal and proper official authority, that she has trachoma, which is "a loathsome or a dangerous contagious disease."

"An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor.

"Be it enacted," etc., "that the following classes of aliens shall be excluded from admission (2) into the United States, in accordance with the

[1] Reversed on confession of error.

existing acts regulating immigration, other than those concerning Chinese laborers: (3) All idiots, insane persons. Paupers or persons likely to become a public charge. Persons suffering from a loathsome or a dangerous contagious disease. Persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude. Polygamists. * * *"

There is jurisdiction in the court to pass determinatively on the mixed issue of law and fact as to whether or not petitioner is an alien immigrant. If she is an alien immigrant, in the meaning of the statute, the court must, on a proper state of case, recognize as authoritative and final the action of the officials upon which respondent grounds his action in the premises, notwithstanding it may be clear enough upon the facts that the child is afflicted with trachoma, which appears to mean only commonplace sore eyes. The power of local inspectors over immigrant passengers is confined to alien immigrants. The question as to whether a person ordered to be returned is an alien immigrant, under the policy of the naturalization laws, is jurisdictional in these proceedings. The rights of such an alien immigrant are not civic privileges. They are said to be merely of a statutory character. The quality or degree of such rights is treated of and determined by congress as involving political questions. Congress may treat, as it seems to have done, their rights, if they have any, as being "outside of the constitution," and forbid the complaints of such an alien immigrant, seeking to reside here, for relief, to be heard or passed upon in a judicial forum. On the other hand, if the child is not such an alien immigrant as the statute contemplates, the court, under these proceedings, on a proper case, may vindicate her civic privileges and give her the relief sought. On the issue as to petitioner being an alien immigrant vel non, it seems to be conceded that the father and mother of the child have been for several years, and are now, residential citizens of the city of New Orleans; that they, on leaving Italy, left their child, the petitioner, there with her relatives; that some time ago the father, before sending for the child to come to him, made his first declaration of intention under the naturalization laws. Citizenship in the United States seems to be a doubtful quantity. It may be of several qualities. In one person it may be full and complete, and of an inchoate and conditional character in another. The naturalization laws are made up of a series of statutes of old and new dates. The system does not, so far as judicial opinions in the federal and state courts have been expressive of their meaning, seem to be clearly understood. The state as well as the federal courts have found it difficult to establish uniform jurisprudence as to the civic rights of aliens who invoke the aid of our laws. In Boyd v. Nebraska, 143 U. S. 177, 12 Sup. Ct. 375, 36 L. Ed. 103, matters bearing in some degree on the legal issues in this case were considered by Mr. Chief Justice Fuller. The plaintiff therein was seeking, among other things, to avail himself of a civic privilege which he claimed the law vested in him because his father, an alien resident, had made, during the minority of his son, who was born here, his first declaration under the naturalization laws. In discussing section 2168, Rev. St., which is as follows:

"Sec. 2168. When any alien, who has complied with the first condition specified in section twenty-one hundred and sixty-five, dies before he is actually naturalized, the widow and the children of such alien shall be considered as citizens of the United States, and shall be entitled to all rights and privileges as such, upon taking the oaths prescribed by law."

—The chief justice says:

"The statutory provisions leave much to be desired, and the attention of congress has been called to the condition of the laws in reference to election of nationality, and to the desirability of a clear definition of the status of minor children of fathers who had declared their intention to become citizens, but had failed to perfect their naturalization, and of the status gained by those of full age by the declaration of intention. 2 Whart. Int. Dig. 340, 341, 350. Clearly, minors acquire an inchoate status by declaration of intention on the part of their parents."

A cursory consideration of the federal and state courts' decisions in cases involving the civic rights or privileges of aliens will demonstrate the appropriateness of the suggestions quoted from the opinion of Mr. Chief Justice Fuller.

Under the views which United States courts as well as state courts have expressed, while engaged in the purpose to judicially differentiate or classify such civic rights as congress has conferred on aliens living as residential citizens in this country, it may be that the father of the child on whose behalf this writ is sued out, by operation of law, on the state of facts conceded to be true, is vested with such "inchoate status" of citizenship as should forbid the treasury officials to impose the status of an alien immigrant on the petitioner. The force of the suggestion that the child, under the policy of the naturalization laws, may not be an alien immigrant, is not without some degree of authority in the United States courts, and in the declarations and contentions of eminent officials of the United States to whom have been confided the consideration of the gravest of our international questions. A review of such authorities will show a liberal tendency towards enlarging the rights of minors who claim, under the policy of our law, to share with their alien parents the benefit of such civic rights as may be, as Mr. Chief Justice Fuller says, "impressed upon them" by operation of the naturalization laws on the fact that the father has made his declaration of intention. Clearly, if the petitioner, on coming here to join her father, had found him a naturalized citizen, she could not, under the policy of the law, have been treated as an alien immigrant, so as to prohibit her from entering this city, however loathsome, contagious, or dangerous a disease her sore eyes might prove to be. Of course, the state, exercising police power, might have subjected her to quarantine. The naturalization of the husband who died, leaving a widow who never resided in the United States, confers citizenship on her. Kane v. McCarthy, 63 N. C. 299; Burton v. Burton, *40 N. Y. 359. A wife becomes a citizen after the husband's preliminary declaration, and before his naturalization, in case of his death. His minor children, under similar circumstances, if living here, would become citizens. Schrimpf v. Settegast, 38 Tex. 96. In Campbell v. Gordon, 6 Cranch, 176, 3 L. Ed. 190, it was

held substantially that the daughter, living abroad, of a naturalized citizen, who came to join him two years after his naturalization, became on her arrival a citizen. A minor child not in this country when the father is naturalized may, on coming here as a minor, take the civic status of the father. See Foreign Relations of United States, vol. 1884.

To generalize as to conclusions from such authorities, I think it may be shown that if the father, in this case, had gone, with the intention of returning, on a visit to Italy, after he had taken up his residential citizenship here, and before he had made his said declaration, he would not, under the policy of the naturalization laws, have been treated as an alien immigrant on his return here. In re Panzara (D. C.) 51 Fed. 275; In re Maiola (C. C.) 67 Fed. 114. If after making said declaration he had gone to Italy, to bring his child home with him, the child, on coming to this port to live with him on his return, could not have, under the statute, been denied the right to come into this country free from inspection under the statute. Under such a condition she would have been the beneficiary, to that extent, of her father's inchoate citizenship. What difference, under the policy of the law, would or should it make if he had, instead of going to Italy for his child, sent for her, as he did in this case? If a child's mother, after a residential citizenship here, had given birth to a child while the parents were on a visit to Italy, such a child, on returning with them, would not be an alien immigrant. If an alien father should become a naturalized citizen of the United States, his minor children, though living in a foreign country at the time of his naturalization, would become citizens of this country on their arrival here to live with him. If an alien widow brings a minor son of deceased alien husband to this country, and marries a citizen of the United States, both she and the son become citizens. If an alien residential citizen who has taken out his said declaration papers should go abroad, and be subjected to pains or penalties imposed unlawfully upon him by the foreign government of which he was native, the United States could not interpose for his relief; but if the same person had, while remaining in some other government than that of his origin, complained of and sought relief from afflictions, such as that of unlawfully impressing him into the army, imposed upon him in that government, the United States would have been justified, on proper showing, to interfere for the protection of his inchoate citizenship. Foreign Relations of United States (1884) p. 552. These illustrations, selected from such authorities as I have referred to, show that, under the policy of the naturalization laws, alien residential citizens, though not naturalized, may possess an "inchoate status" of citizenship, which may, under the policy of the naturalization laws, vest such rights of citizenship in this petitioner on her arrival at this port, which should forbid her deportation as an alien immigrant, even though, in the opinion of the local inspectors, she may be afflicted with a dangerous contagious disease. Such illustrations show that the petitioner, though an alien, may not be an "alien immigrant," under the statute.

I began this review of authorities under the impression that it would be necessary for the court to determinatively pass upon the issue that petitioner is an alien immigrant, raised by respondent's answer; but, on looking further into the state of case presented on the hearing, it occurs to me that when a proper deference is given to the due processes of law to which she is entitled in the United States courts even though she be an "alien immigrant," the case may be disposed of favorably to her without passing upon any of the legal issues as to her being an alien immigrant, to which matters the authorities I have cited may apply. The matter as to such alienage vel non of the petitioner was not put at issue on the hearing by either side, except so far as the child's father, in his evidence, said that he and his wife, the child's mother, came to the United States about four years ago, and that they have continued during that time to reside as residential citizens in this city; that when they left Italy their child, the petitioner, was left by them with some relations; that lately the child came to this city, at his instance, on board of the steamship Sempione, accompanied by her said relatives; that several weeks ago, before the child left Italy, he took out his first naturalization papers, a copy of which is filed in this suit. There were two witnesses, inclusive of the father, heard on behalf of the petitioner; the other witness, Dr. Duggan, testifying over objections which are evidenced by a bill of exceptions on the part of the respondent's counsel. The doctor said, substantially, that the child had sore eyes, or granulated eyelids,—a very common disease with children; that the disease was not a loathsome disease, but is a dangerous contagious disease if other persons were allowed to use the towels with which the child had wiped her eyes; that the disease was readily curable in a few days or weeks. Respondent's counsel, in closing his bill of exceptions, said correctly that "the foregoing was substantially all the testimony in the cause,"—meaning the evidence of the two witnesses named. Under my view of the matters occurring on the hearing, there was neither oral nor documentary evidence filed, or tendered for filing, on behalf of respondent. The clerk's minutes show no filing of documents on behalf of respondent, other than the answer. On examination of the papers filed on the hearing, it appears that the clerk's filing mark is on the back of respondent's answer. To the answer copies of certain papers are annexed. None of those copies were filed, or tendered to the court for filing, on the hearing. The said copies are mentioned in the recitals in the answer as "annexes." Respondent in his answer says he annexes "a copy of his report February 28, 1901, giving the facts and circumstances of the case, and a copy of the telegraphic order from the commissioner general of immigration, above referred to." It seems that the said copies were pinned in or to the answer on which the clerk's filing mark appears. They were not offered or read to the court as exhibits. I knew nothing of their existence until I found them, after the hearing, among the papers. There is nothing in the allegations of the answer to suggest that the respondent appropriated or tendered their contents as a part of his answer to the writ of habeas corpus;

nor does it appear from the recitals in the affidavit verifying the answer that the affiant intended to swear to the truth of anything in relation to such copies, except as he said that such copies show "the facts and circumstances of the case" which was passed upon by the local inspectors. Under such a state of case, should such copies or "annexes" be given any legal effect in support of respondent's contention that the child may be legally deported? As between the commissioner general of immigration and the collector, such papers, or copies, may be abundant official authority to cause the child to be deported in accordance with such telegraphic orders; but I think no legal effect adverse to the petitioner, on the hearing of petitioner's writ, can be given to them. It is recited in the annexes that an appeal suspending the action of the local inspectors was taken on behalf of the petitioner. What has become of her appeal? Respondent, proposing to show the dismissal of petitioner's appeal, and to vindicate his purpose to deport the child, says that the following telegraphic order accompanying the annexes was directed to him:

"Appeal dismissed in case Grazia Di Simone. Deport her in accordance with law. Suggest that one of her grown relatives accompany child.
"F. H. Larned, Acting Comm'r Gen'l.
"Approved: H. A. Taylor, Asst. Secty."

Conceding that all of said copies were seasonably tendered as exhibits in evidence on the hearing without objection, and conceding, further, that the local inspectors were fully authorized, under the statute, on "the facts and circumstances of the case," as such facts and circumstances appeared to them on their investigation, to cause the child to be deported to Italy, I do not think it will be seriously contended that either the petitioner or the respondent official has been advised by an authentic mandate or in a legal way, as between the parties to this proceeding, that the decision of the local inspectors has been determinatively passed upon by the official at Washington, D. C., to whom the law directs the appeal may be made. So far as we have been advised by any authentic or legal authority, petitioner's appeal may still be pending. Certainly during the pendency of the child's appeal she cannot be legally deported. It is true that zealous local officials often unrestrainedly arrest and deprive citizens of their liberty, and bring them to trial before courts of inferior jurisdiction, on such telegraphic orders as upon which respondent now offers to vindicate his purpose to deport the child. But it is equally true that such an order is not entitled to the legal effect on the hearing of this case which is sought to be given to it in respondent's answer. An alien immigrant desiring to come into and reside in this country is not privileged, under the law of the land, to have the issue of fact as to whether or not he may have a loathsome or dangerous contagious disease passed upon in a judicial forum. As to such an inquiry he is "outside of the constitution." Possibly, when such material issues of fact are to be passed upon determinatively by zealous officials, his civil privileges may be only those of an "Indian not taxed." All such issues, vital as they may be, as to him, it seems, must be heard and passed upon

finally on the bridgeway of a ship, by such local inspectors as the treasury department may select to make such investigation. There were two different issues presented to the inspectors investigating "the facts and circumstances of the case"; one of them involving grave questions of both domestic and international law, which have not since the organization of the national courts been free therein from plaguing difficulties (that is, as to whether the petitioner, notwithstanding the "inchoate status" of the father's citizenship, on her coming to this port, is an alien immigrant). The other is an issue of fact, as to whether her granulated eyelids showed a loathsome or dangerous contagious disease. Certainly the former, however readily the local inspectors disposed of it adversely to the petitioner, is a serious and perplexing judicial question, for the decision of which, I think, an alien immigrant should justly be entitled to invoke the aid of judicial process. The inspectors had to decide that judicial question adversely to the petitioner before they could take up and pass on the character of her malady. They seem to have had no difficulty in disposing of the law issue,—probably less than they had in holding that granulated eyelids constituted a loathsome or dangerous contagious disease, under the policy and purpose of the statute. It seems that the local inspectors, under the rules of practice prevailing in the treasury department, exercise prerogative powers to the extent that, on their finding adversely to the petitioner, a child of tender years may be separated from and deported away from her father, whatever his legal or civic status may be, and that on appeal from their finding, on the bridgeway of the ship, to the higher officials of that department, at Washington, D. C., the appeal which took up both of the serious and difficult issues may be decided so as to cause the deportation of his child on the authority of a copy of an unverified telegraphic order. Such methods of official practice, however satisfactory they may be to the department, or however much it may "speed the cause," or indemnify the collector as between himself and the department, should he now be free to obey it, are not admissible in judicial inquiries under such due process of law as even an alien immigrant is entitled to in the national courts, to show that final action has been had in the treasury department on petitioner's appeal. Such an order, disposing of an appeal, for instance, to the commissioner of the land department, involving an issue simply of an acre of government land, could not legally be so summarily disposed of. It does not appear to have been essential, in the public interest, that this child should be hurriedly deported, on the returning ship, because, as it seems, the captain thereof was urgent to leave the port. Such zealous officials as were in this case managing the public interests could doubtless have found satisfactory means of preventing contagion while holding her here, even though the ship sailed away, until a more authoritative mandate from Washington could have reached them, denying the relief sought on her appeal. But, let all of this be as it may, it is clear, when an alien immigrant submits a jurisdictional issue to a judicial forum, he has plenary privileges therein to have all such issues heard and determined under due

processes of law. It would be violative of such processes of law to give any legal effect to the copy of a telegraphic order to support the collector's purpose to deport the petitioner. Particularly should this be maintained when the contents of the copy of the telegraphic order are not verified by oral evidence on the hearing. If the contents of the other "annexes" had been appropriated as exhibits, and declared upon as a part of respondent's answer, such unverified exhibits would not of themselves be of any legal value to support respondent's claim for justification; nor could they have been considered as importing legal verity as to any of the material issues submitted in the pleadings.

The matter to be determined in this proceeding is whether the petitioner can now be held for deportation. It may be that, under rules of practice on habeas corpus, petitioner should not be discharged for defect in the method or for want of due process in the proceedings before the inspectors. But petitioner's discharge is not sought because of such defects. The contention is that there is no legal evidence to show that any thing or duty imposed on the inspectors by the law was done by them. Particularly is it contended that there is no legal evidence to show that petitioner's appeal has been disposed of. Until such a state of case is shown, the appeal must be considered as pending, and the child cannot be legally deported. On the hearing of the issues set up in proceedings like these, a petitioner may be permitted, in an informal way, to show and make good his cause of action. The filing of a written traverse on his part of the allegations in the respondent's answer is not required in the rules of practice in most of the states. The rules of practice in this state, I think, will interpose on petitioner's behalf sufficient denials of the material matters set up by respondent for justification. Even if such allegations should, under the rules of practice, have to be traversed by the petitioner, it is clear that a formal traverse could be required only as to such exhibits as show justification, such as were declared upon as a part of respondent's answer, and such as import authenticity and legal verity.

It may not be too foreign to the best methods of stating judicial thought, or, at any rate, it may not be injudicious, for me to tender here, on behalf of the public, as well as on behalf of the alien child who is threatened with deportation, the suggestion that an exhibition of less superserviceable official zeal, or, it may be, a more considerate exercise of official authority, on the part of the local inspectors in the pending matter, might have enabled them to know that trachoma, however frightfully suggestive of loathsome things such high-sounding technicality may appear in their official report, means, as I was glad to learn later, at its worst, only a case of everyday sore eyes, which the doctor said is readily curable. A more considerate action on their part would, I may venture to say, have presented a refreshing sight for the public, even if such a sight, to use an old saying, had not proven to be "a sight good for sore eyes."

Without passing determinatively on the extent to which the petitioner may or should be treated as the beneficiary of the "inchoate status" or rights of citizenship which, under the views of Mr. Chief

Justice Fuller in the case of Boyd v. Nebraska, referred to herein, the father is now possessed of, I think, on the state of case presented on the hearing, and in the absence of any suggestion on behalf of respondent that she should be held to answer further, that the petitioner, though she may be an alien immigrant, should be set at liberty to join and live here with her parents, who are residential citizens of this city.